### General Civil Case Filing Information Form (Non-Domestic)  gasccc-03

**Court**  — County __CHATHAM__   **Date Filed** 12/23/2010
☑ **Superior**                                              MM-DD-YYYY
☐ **State**        **Docket #** _STCV_ 10-1961TR

**Plaintiff(s)**
Degenhart, William, M.D.
Last   First   Middle I. Suffix Prefix   Maiden

Last   First   Middle I. Suffix Prefix   Maiden

Last   First   Middle I. Suffix Prefix   Maiden

Last   First   Middle I. Suffix Prefix   Maiden

**Defendant(s)**
Plantation Federal Bank
Last   First   Middle I. Suffix Prefix   Maiden

The Degenhart Law Firm
Last   First   Middle I. Suffix Prefix   Maiden

Degenhart, Paul
Last   First   Middle I. Suffix Prefix   Maiden

Degenhart, Mary Nell
Last   First   Middle I. Suffix Prefix   Maiden

**No. of Plaintiffs** _1_

**No. of Defendants** _4_

**Plaintiff/Petitioner's Attorney**  ☐ **Pro Se**

Savage, Brent J.
Last      First      Middle I.   Suffix

**Bar #** 627450

---

**Check Primary Type** (Check only **ONE**)

☐ Contract/Account
☐ Wills/Estate
☐ Real Property
☐ Dispossessory/Distress
☐ Personal Property
☐ Equity
☐ Habeas Corpus
☐ Appeals, Reviews
☐ Post Judgment Garnishment, Attachment, or Other Relief
☐ Non-Domestic Contempt
☑ Tort (If tort, fill in right column)
☐ Other General Civil Specify _____

**If Tort is Case Type:**
(Check no more than **TWO**)

☐ Auto Accident
☐ Premises Liability
☐ Medical Malpractice
☐ Other Professional Negligence
☐ Product Liability
☑ Other Specify  Declaratory Judgment

**Are Punitive Damages Pleaded?** ☐ Yes ☐ No

**DEFENDANT'S EXHIBIT** ___
PENGAD 800-631-6989

15. General Civil Case Filing Information Form (Non-Domestic) 09-05

IN THE SUPERIOR COURT OF CHATHAM COUNTY
STATE OF GEORGIA

WILLIAM DEGENHART, M.D.,

     Plaintiff,

-vs-

PLANTATION FEDERAL BANK,
Individually and as Successor
in Interest to FIRST SAVERS
BANK, THE DEGENHART LAW FIRM,
PAUL DEGENHART and MARY NELL
DEGENHART,

     Defendants.

Civil Action No.

CV10 1961-PR

## COMPLAINT FOR DAMAGES AND
## PETITION FOR DECLARATORY JUDGMENT

**COMES NOW,** WILLIAM DEGENHART, M.D., by and through his counsel, and states the following as his complaint:

### PARTIES, JURISDICTION, AND VENUE

     1.   William Degenhart, M.D., is a resident of Savannah, Chatham County, Georgia.

     2.   Upon information and belief, Defendant Plantation Federal Bank is a Federal Savings Bank, with its principal place of business located at 11039 Ocean Highway, Pawley's Island, South Carolina 29585.   Upon information and belief, Plantation Federal Bank is the successor in interest to First Savers Bank via a merger which took place in or around 2008.   For the purposes of this Complaint, this entity will hereinafter be referred to as "Plantation Federal Bank."

3.   On information and belief, Defendant The Degenhart Law Firm, P.A., is a professional association organized and existing under the laws of the State of South Carolina, with its principal place of business located at 2131 Park Street, Columbia, South Carolina, 29201.  This Defendant may be served with process by and through its registered agent, Mary Nell Degenhart, at 2131 Park Street, Columbia, South Carolina, 29201.

4.   Defendant Paul Degenhart is an attorney licensed to practice law in the states of Georgia, Nebraska, and South Carolina.  Upon information and belief, Paul Degenhart is a citizen of the state of South Carolina.

5.   Defendant Mary Nell Degenhart is an attorney licensed to practice law in South Carolina.  Upon information and belief, Mary Nell Degenhart is a citizen of the state of South Carolina.

6.   Defendants have committed tortious acts, some within this state, which have caused injury to the Plaintiff. Jurisdiction and venue are proper in this Court.

## FACTUAL ALLEGATIONS

7.   Three Amigos Land Company, LLC, is identified as the borrower on certain loan documents held by Defendant Plantation Federal Bank.

8.   Upon information and belief, Defendant Paul Degenhart is a principals of Three Amigos Land Co., LLC.

-2-

9.   Upon information and belief, Defendant Mary Nell Degenhart and Defendant Paul Degenhart are each principals in Defendant The Degenhart Law Firm.

10.   Over the past several months, Plaintiff has learned that his name, or representation of his signature, had been improperly affixed upon certain loan documents, including promissory notes and unconditional guaranty, which purportedly secure certain loans made by Defendant Plantation Federal Bank and Three Amigos Land Co., LLC.  The documents to which the Plaintiff's name has been improperly applied include the following:

a.   "Commitment" Letter Agreement, dated December 1, 2006, between First Savers Bank and Three Amigos Land Company, LLC, outlining the proposed terms of the $1.80 million development loan, a copy of this letter is attached hereto as Exhibit A;

b.   Loan Agreement, dated December 22, 2006, purportedly between Plantation Federal Bank, Three Amigos Land Co., LLC, George M. Lee, III, and Plaintiff (a copy of this document is attached hereto as Exhibit B);

c.   Guaranty Agreement, dated December 20, 2006, purportedly executed by Plaintiff, to guaranty

indebetdness of Three Amigos Land Co., LLC (a copy of this document is attached hereto as Exhibit C);

   d.   Letter, dated January 2, 2009, modifying the December 1, 2006 Commitment Letter (identified in Paragraph 10(a), above (a copy of this letter is attached hereto as Exhibit D);

   e.   Promissory Note, dated January 2, 2009, given by Three Amigos Land Co., LLC to Plantation Federal Bank in renewal of December 22, 2006 Loan Agreement, purportedly executed by Plaintiff (a copy of this document is attached hereto as Exhibit E);

   f.   Commercial Loan Agreement, dated January 2, 2009, with Plantation Federal Bank as the Lender, and Three Amigos Land Co., LLC identified as the Borrower (a copy of this document is attached as Exhibit F);

   g.   Promissory Note, dated May 11, 2009, given by Three Amigos Land Co., LLC to Plantation Federal Bank in renewal of December 22, 2006 Loan Agreement, purportedly executed by Plaintiff (a copy of this document is attached hereto as Exhibit G); and

   h.   Guaranty, dated September 23, 2009, purportedly executed by Plaintiff to guaranty the debts

of Three Amigos Land Co., LLC (a copy of this document
is attached hereto as Exhibit H).

11.   Plaintiff did not sign any of these documents, nor
did he authorize the execution of any of the documents identified
in paragraph 10 of the Complaint.

12.   On information and belief, the loan transactions
and renewals identified above, were closed by Defendant The
Degenhart Law Firm.  Allowing presentation of these documents to
Plantation Federal Bank as valid, binding, and duly executed
documents was absolutely improper.

13.   On learning of the fact that his name had been
improperly affixed upon the documents identified in Paragraph 10
of this Complaint, Plaintiff informed Defendant Plantation
Federal Bank of the improper use of his signature.

14.   Despite being informed that the documents
purportedly obligating Plaintiff to Defendant Plantation Federal
Bank, said Bank continues to insist that said documents are valid
and biding, and has improperly presented claims under these
documents against Plaintiff.

15.   On information and belief, Plantation Federal Bank
failed to follow both its own guidelines and industry regulations
designed to prevent improper use of signatures in bank documents,
and to protect individuals such as Plaintiff from being falsely

and unjustly bound to the debt obligations of others.  These
failures include, but are not limited to,

> (a)   allowing a principal in the borrower to close
> the loans at issue in this case;

> (c)   attempting to bind Plaintiff as a guarantor
> of the Three Amigos Land Co., LLC without proper
> documentation as to the validity of the guaranty or of
> the signatures affixed to the loan documents; and

> (c)   by failing to assure proper corporate
> resolutions were in place to allow consummation of the
> loan transaction.

Failure of Defendant Plantation Federal Bank to follow these
obligations has allowed Defendants Paul Degenhart, Mary Nell
Degenhart, and The Degenhart Law Firm to cause the harm to
Plaintiff as alleged herein.

### CAUSES OF ACTION

### COUNT I - BREACH OF DUTY

16.   The Plaintiff reincorporates Paragraphs 1 through
15 as if realleged herein.

17.   Defendants Paul Degenhart and Mary Nell Degenhart
and attorneys licensed to practice law.  Through their law firm,
Defendant The Degenhart Law Firm, LLC, these Defendants offer and
provide legal services to the public.

-6-

18.  In his dealings with Defendants Paul Degenhart, Mary Nell Degenhart, and/or The Degenhart Law Firm, Plaintiff expected, and was in fact owed, the benefit of the professional judgment, knowledge, and skill possessed by individuals authorized to practice law.

19. Defendants Paul Degenhart, Mary Nell Degenhart, and/or The Degenhart Law Firm, failed to provide the Plaintiff with the benefit of their professional skill and judgment by allowing false and/or improperly utilized signatures to be affixed to documents executed to allow Defendant Plantation Federal1 Bank to extend financing to Three Amigos Land Co., LLC. Pursuant to O.C.G.A. § 9-11-9.1, attached as Exhibit "I" is the Affidavit of Kenneth Futch, an attorney licensed to practice law, which sets forth at least one (1) negligent act against the Defendants the Degenhart Law firm, Paul Degenhart, and Mary Nell Degenhart).

20.  Defendant Plantation Federal Bank breached the standard of care applicable to the banking industry through accepting loan documents as valid and binding without taking independent action to verify the validity of the signatures thereto.

21.   The combined negligent acts of the Defendants have improperly led Plantation Federal Bank to attempt to enforce the debt obligations of Three Amigos Land Co., LLC against Plaintiff.

## COUNT II - CLAIM FOR DECLARATORY JUDGMENT

22.   The Plaintiff reincorporates Paragraphs 1 through 15 as if realleged herein.

23.   Plaintiff never signed any of the documents attached hereto as Exhibits A through H.

24.   Plaintiff never authorized any individual or entity to affix or reproduce his signature on any of the documents attached hereto as Exhibits A through H.

25.   Therefore, the Plaintiff is not bound to any of the financial obligations referenced or described in the documents attached hereto as Exhibit A through H.

26.   Defendant Plantation Federal Bank has initiated efforts to enforce the financial obligations purportedly undertaken by Plaintiff, under its position that his signature properly appears on these documents.

27.   A justiciable controversy therefore exists between Defendant Plantation Federal Bank and Plaintiff.  Plaintiff is in need of a declaration of his rights, i.e., that he not be held legally or equitably accountable for the debts of Three Amigos Land Company, LLC.

-8-

28.   Pursuant to this Court's equitable powers, Plaintiff requests this Court declare as to him that the legal documents attached as Exhibits A through H are unenforceable as to Plaintiff.

WHEREFORE, Plaintiff prays:

(a)   process issue and Defendants be required to answer this lawsuit;

(b)   that this Court enter an order declaring Plaintiff has no legal obligation to Plantation Federal Bank, and that the documents attached hereto as Exhibits A through H are null and void as they pertain to Plaintiff;

(c)   that Plaintiff have judgment against Defendants in an amount proved at trial; and

(d)   for such other just and equitable relief as may be deemed proper and necessary.

THIS THE _____27TH_____ DAY OF __DECEMBER__, 2010.


                              SAVAGE, TURNER, KRAEUTER, PINCKNEY,
                              BRITT & MADISON

                         BY:  _____
                              Brent J. Savage
                              Georgia Bar No. 627450


304 East Bay Street
Post Office Box 10600
Savannah, Georgia  31412
(912) 231-1140



**FIRST SAVERS BANK**

December 1, 2006

Three Amigos Land Company, LLC
c/o George Lee
Professional Realty, Inc.
8910 Two Notch Road, Suite 302
Columbia, South Carolina 29223

Re:  $1.80MM Development Loan to Three Amigos Land Company, LLC

Dear Gentlemen:

This letter constitutes the commitment of First Savers Bank (the "Bank") to make a loan (the "Loan") to the borrower described below (the "Borrower") under the following terms and conditions:

       **General Terms.**

| | |
|---|---|
| **Borrower** | Three Amigos Land Company, LLC |
| **Guarantor** | The Loan will be unconditionally guaranteed by George Lee, William Degenhart, and Paul Degenhart.  Notwithstanding the above, the above mentioned guarantors liability under the loan will be limited to the following percentages: |
| | George Lee              50% |
| | William Degenhart   25% |
| | Paul Degenhart       25% |
| **Loan Amount** | $1,800,000 |
| **Type of Loan** | Development |
| **Purpose of Loan** | Provide funds for the purchase and 3.79 acres of land located at the intersection of Highway 17 and Airport Road in Jacksonville, Florida.  Borrower intends to develop this parcel into three retail out-parcels. |
| **Collateral** | The Loan will be secured by a title-insured, first real estate mortgage on the property described in the Purpose of Loan above.<br>Assignment of all Rents, Leases, and Profits. |
| **Interest Rate** | 30-day LIBOR Base Rate plus 2.50% |

| | |
|---|---|
| Fees and Expenses | Borrower shall pay Bank a commitment fee of $9,000.00 at the closing of the loan. |
| | Borrower also shall pay all costs and expenses incident to the Loan. The foregoing shall be paid by Borrower even if the Loan does not close. The Bank designates Lindsey Smith as its counsel. |
| Payment Terms | Interest only for twenty three (23) months. One final payment of all principal plus any accrued but unpaid interest shall be due and payable upon the maturity |

of the loan, 24 months from the loan closing.

| | |
|---|---|
| **Loan     to Value** | An appraisal will be ordered by the Bank and must be found acceptable to the Bank prior to the Loan closing.  The loan amount shall not exceed 75% of the appraised value. |
| **Loan Advances** | Bank will make Loan Advances based upon completed construction and installation only.  All construction draws will include a draw request in form and substance satisfactory to Bank.  Advances will be made on a pro-rata basis in accordance with the percentage of completion.  Borrower shall use Loan proceeds only for construction purposes.   All advances shall be made in accordance with the terms and conditions of a loan agreement.  Borrower shall only be entitled to one advance per calendar month. |

## Reporting Requirements And Operating Covenants.

| | |
|---|---|
| **Financial Reporting** | The Borrower and Guarantors shall provide the Bank with annual financial statements and tax returns. |

## Loan Documentation  And Other Closing Requirements.

| | |
|---|---|
| **Loan Documentation** | The Loan and Bank's liens and security interests in the Collateral shall be evidenced by this commitment letter, and also shall be evidenced and supported by such additional loan documents ("Loan Documents") as Bank and its counsel deem necessary, including a promissory note from Borrower to Bank in the face amount of the Loan.  The Loan Documents shall be in form and contain substantive content satisfactory to Bank and its counsel.  All Loan Documents must be executed and delivered to Bank, and if required by Bank's counsel, filed or recorded, at or before closing. |
| **Authority Documents** | Borrower shall furnish to Bank a certified copy of its organizational documents, together with resolutions approving the Loan, and a certified certificate of authority from Borrower's state of organization, all of which shall be current, in effect as of closing and otherwise satisfactory to Bank and its counsel. |
| **Counsel's Opinion** | A written opinion shall be furnished at, and effective as of, closing by Borrower's independent counsel and the opinion shall be in form and substance satisfactory to Bank and its counsel. |

| | |
|---|---|
| **Insurance** | Borrower shall provide to Bank at closing evidence satisfactory to Bank that the following insurance is in effect as of closing: builders risk and general liability insurance. The insurance shall be in amounts, with companies and on terms acceptable to Bank; it shall show Bank as a mortgagee or loss payee, as instructed by Bank; and it shall be continuously maintained in force by Borrower until the Loan is repaid in full. |
| **Banking Relationship** | The Bank requests that the Borrower maintain its primary deposit accounts with the Bank. |
| **Additional Requirements** | Borrower and Guarantor shall satisfy all such other terms and conditions as Bank and its counsel deem necessary to ensure the proper documentation of the Loan, the perfection of the liens and security interests in the Collateral and compliance with all laws and regulations applicable to Bank, Borrower, and Guarantor relative to the Loan. The additional requirements shall include, without limitation, those set forth in <u>Attachment 1.</u> |

## Miscellaneous.

| | |
|---|---|
| **Conditions Precedent** | The obligations of Bank to close are subject to the satisfaction of all of the terms and conditions of this commitment letter and the Loan Documents in a manner satisfactory to Bank and its counsel. Without limiting the foregoing, but in furtherance thereof, a condition precedent to closing is Borrower demonstrating to Bank that the Collateral does not present environmental risks or liabilities that are unacceptable to Bank. |
| **Borrower Certification** | The acceptance of this commitment shall constitute a certification by the person executing the acceptance that all material matters relating to Borrower and Guarantor have been disclosed to Bank and that there has been no material, adverse change in Borrower, to include its financial condition and operating condition, or Guarantor. |
| **No Change** | The obligation of Bank to make the Loan is conditioned upon there being no material adverse changes in the financial or operating condition of Borrower or Guarantor. |
| **Non-Assignability** | This commitment is for the sole benefit of Borrower and no other Person shall have any rights under this commitment against Bank, including any bankruptcy trustee or debtor in possession. This commitment may not be assigned without the prior written consent of Bank. |

This commitment and all terms and provisions hereto shall survive the closing of the loan and shall not be merged into any of the loan documents. This commitment shall be interpreted, construed and enforced according the Laws of the State of South Carolina. All expenses incident to the making, closing and enforcement of the loan, including, without limitation, attorney fees, insurance premiums, shall be paid by the Borrower. If this commitment is acceptable, please indicate by signing in the space provided of this commitment and return to us no later than December 8, 2006. The bank will have no obligation to fund the loan if the loan does not close prior to January 1, 2007.

It is our pleasure to assist you in the project and should you have any questions, please feel free to contact me at (864) 286-2270.

Sincerely,

William M. Aiken, III     Randy Bell
Director of Real Estate Banking    Senior Vice President
Plantation Financial Corporation    First Savers Bank

**ACCEPTED AND AGREED TO THIS 5th Day of December 2006**

**AS BORROWER FOR Three Amigos Land Company, LLC**

By: _____
George Lee, Manager

**AS GUARANTOR**

_____
George Lee, guarantor

_____
William Degenhart, guarantor

## LOAN AGREEMENT

THIS LOAN AGREEMENT (the "Agreement") is made and entered into as of this 22ⁿᵈ day of December, 2006 (the "Effective Date") by and among **THREE AMIGOS LAND CO., LLC**, a South Carolina limited liability company (the "Borrower"), **GEORGE M. LEE, III, WILLIAM J. DEGENHART,** and **PAUL V. DEGENHART** (collectively, the "Guarantors") and **FIRST SAVERS BANK** (the "Lender").

### W I T N E S S E T H:

The Borrower has applied to the Lender for certain revolving credit financing more particularly described hereinafter and the Lender is willing to extend such financing to the Borrower upon compliance by the Obligors with the terms and provisions hereof. Therefore, in consideration of the mutual covenants, terms, provisions and conditions set forth hereinafter and of the financing identified hereinafter to be provided by the Lender to the Borrower and for other good and valuable consideration, the receipt and sufficiency of all of which are hereby acknowledged, the Borrower, the Guarantors and the Lender hereby agree as follows:

### ARTICLE ONE
### DEFINITIONS

As used in this Agreement, the following terms shall have the following meanings:

1.1   ADVANCE.   Each advance of Loan proceeds hereunder made by the Lender to or for the benefit of the Borrower to enable the Property to be acquired and the Improvements to be constructed and which may consist of Direct Costs and Indirect Costs, less any retainages provided hereinafter.

1.3   BUDGET.   The Development Cost Analysis attached hereto and incorporated herein as Exhibit "B".

1.4   CLOSING.   The date of the execution and delivery of this Agreement by the Obligors and the Lender.

1.5   CONSTRUCTION ASSIGNMENT.   The Assignment of Construction Documents executed and delivered by the Borrower and the Engineer to the Lender as security for the Obligations with respect to the construction and installation by the Borrower of the Improvements within the Property.

1.6   CONSTRUCTION CONTRACT.   The contract to be entered into by and between the Borrower and the Contractor, and such other contracts between the Borrower

1

and the Contractor or with other contractors as shall be approved in writing by the Lender for the construction and installation of the Improvements.

1.7    CONSTRUCTION COSTS.  All costs to be incurred by the Borrower in the construction and installation of the Improvements consisting, collectively, of the Direct Costs and the Indirect Costs.

1.8    CONSTRUCTION DOCUMENTS.  Collectively, the Construction Contract, the Engineering Contract, the Plans, and all other documents enumerated in Section 3.5 hereinafter.

1.9    CONTRACT ASSIGNMENT.  The Assignment of Contracts, Contract Rights, Leases, Rents and Profits executed by the Borrower to the Lender herewith as security for the Obligations.

1.10    CONTRACTOR.  The licensed general contractor who shall perform labor and furnish materials to the Borrower pursuant to the Construction Contract for construction of all or any portion of the Improvements.

1.11    DIRECT COSTS.  All expenditures, excluding Indirect Costs, incurred or to be incurred by the Borrower for site preparation, installation of utilities, infrastructure and landscaping at the Property, and for the furnishing of labor and materials pursuant to the Construction Contract in connection with the construction and installation of the Improvements.

1.12    ENGINEER.    The civil engineering firm engaged by the Borrower pursuant to the Engineer's Contract to design the Improvements to be constructed and installed upon the Property, to prepare the Plans, and to render other engineering services related thereto.

1.13    ENGINEER'S CONTRACT.  The Agreement to be entered into between the Borrower and the Engineer for the design of the Improvements to be constructed and installed upon the Property, for the development of the Plans, and for other engineering services related to the design and construction of the Improvements.

1.14    GOVERNMENTAL AUTHORITIES.  Any federal, state or local governmental, quasi-governmental or regulatory authority, agency, department, commission, board, bureau, instrumentality or subdivision, including courts, tribunals and arbitrators.

1.15    GOVERNMENTAL REQUIREMENTS.  All laws, ordinances, orders, rules or regulations of all Governmental Authorities, including without limitation zoning ordinances, subdivision regulations, building codes, environmental regulations, public

2

WCSR 3501184v2

health regulations, fire protection codes, and all other laws, ordinances, orders, rules or regulations imposed by applicable Governmental Authorities.

1.16   GUARANTEES.   The Guaranty Agreements of even date from the Guarantors to the Lender securing the Obligations.

1.17   HAZARDOUS MATERIALS. Any substance (i) which is or becomes defined as a "hazardous waste", "hazardous substance", pollutant or contaminant under any Governmental Requirement relating to the protection of human health or the environment including, without limitation, the Comprehensive Environmental Response, Compensation and Liability Act (42 U.S.C. Section 9601, et. seq.), and the Resource Conservation and Recovery Act (42 U.S.C. Section 6903, et. seq.), (ii) the presence of which requires investigation or remediation under any Governmental Requirement relating to the protection of human health or the environment; (iii) which is toxic, explosive, corrosive, flammable, infectious, radioactive, carcinogenic, mutagenic, or otherwise hazardous and is or may become regulated by any Governmental Authorities; (iv) the presence of which on the Property causes or threatens to cause a nuisance upon the Property or to adjacent properties, or poses or threatens to pose a hazard to the health or safety of persons on or about the Property or adjacent properties; (v) the presence of which on adjacent properties could constitute a trespass thereon by the Borrower; or (vi) which contains gasoline, diesel fuel, other petroleum hydrocarbons, asbestos, asbestos-containing materials, formaldehyde, or polychlorinated biphenyls in violation of applicable Governmental Requirements.

1.18   IMPROVEMENTS. The streets and roads, parking facilities, drainage facilities, utilities, infrastructure, and on-site improvements that shall be constructed and installed by the Borrower upon the Property, and which shall be necessary or desirable in order to support the development of the Property into retail outparcels.

1.19   INDIRECT COSTS.   All expenditures incurred or to be incurred by the Borrower in connection with or incidental to the acquisition of the Property, the Loan, and the construction and operation of the Improvements set forth in the Budget, other than Direct Costs, including without limitation recording fees, documentary stamps, title insurance premiums, surveyors' charges, civil engineering fees, insurance premiums, appraisal fees, environmental assessment fees, inspection fees, attorneys' fees, taxes, utility charges, permitting fees and charges, project administration fees, and development fees.

1.20   INSPECTING AGENT. Such inspector who shall be designated or employed by the Lender at the expense of the Borrower to review and approve the Plans, to review and inspect the Improvements during the course of construction and installation, to certify to the Lender during construction the extent to which construction and installation of the Improvements has been completed, to review all Draw Requests, to certify to the Lender during construction the extent to which construction and installation

3

of the Improvements has been completed and that the Improvements are being constructed and installed in accordance with the Plans, and to render such other services in connection with the inspection and supervision of the construction and installation of the Improvements as the Lender shall from time to time deem necessary or desirable. The Inspecting Agent shall be a licensed general contractor, a licensed civil engineer, or shall otherwise have sufficient experience as determined by the Lender in its reasonable judgment to enable the Inspecting Agent to properly discharge its duties specified herein.

    1.21   LOAN COMMITMENT. The Loan Commitment Letter from the Lender to the Borrower dated December 1, 2006, accepted by the Borrower on December 5, 2006, a copy of which is attached hereto and incorporated herein as Exhibit "B".

    1.22   LOAN DOCUMENTS. This Agreement, the Note, the Mortgage, the Contract Assignment, the Construction Assignment, the Guarantees, and any and all other Loan Documents, instruments and certificates, required to be executed and/or delivered to the Lender in connection with the Loan as required under any of the terms of this Agreement.

    1.23   LOAN. The financing in the maximum principal sum of One Million Eight Hundred Thousand and No/100 ($1,800,000.00) Dollars being made available to the Borrower by the Lender herewith pursuant to this Agreement, as evidenced by the Note, inclusive of all of the Obligations, collateral and Loan Documents respecting the same.

    1.24   MORTGAGE. The Mortgage, Security Agreement, and Fixture Financing Statement of even date executed by the Borrower to the Lender as security for the Obligations and covering the Property (including the Improvements).

    1.25   NOTE. The Promissory Note of even date from the Borrower to the Lender evidencing the Borrower's obligation to repay to the Lender the principal sum of up to One Million Eight Hundred Thousand and No/100 ($1,800,000.00) Dollars, with interest, in accordance with the terms set forth therein.

    1.26   OBLIGATIONS. All indebtedness, liabilities and obligations to be paid, performed and/or observed by the Obligors in connection with the Loan which are secured by the Mortgage and the Loan Documents and which are defined more fully therein.

    1.27   OBLIGORS. Collectively, the Borrower and the Guarantors.

    1.28   PLANS. The final plans and specifications, including site plan, for the design, construction and installation of the Improvements prepared by the Engineer, which shall be initialed for identification purposes by the Borrower and the Contractor and delivered to the Lender, including all working and shop drawings prepared for use in

4

WCSR 3501184v2

connection therewith, or as may be hereafter altered by change orders approved in writing by the Lender as provided hereinafter.

1.29   PROPERTY.  That certain parcel of land containing approximately three and 79/100 (3.79±) acres located at the intersection of Highway 17 and Airport Road in Jacksonville, Duval county, Florida, more fully identified on Exhibit "A" attached hereto and incorporated herein.

1.30   TITLE INSURER.  Chicago Title Insurance Company.

1.31   TITLE COMMITMENT.   The lender's title insurance commitment number _____ issued by the Title Insurer, effective _____, 2006, at _____ __.m. in the amount of One Million Eight Hundred Thousand and No/100 ($1,800,000.00) Dollars.

### ARTICLE TWO
### THE LOAN TRANSACTION

2.1   FINANCING.  This Agreement is executed by and among the parties hereto for the purpose of setting forth all terms and conditions with respect to the Loan and is intended to include all covenants, conditions, representations and warranties made in connection with the Loan. This Agreement shall be deemed to incorporate by reference all of the terms set forth in all of the Loan Documents. Should any conflict arise between any terms of this Agreement and any terms of the Loan Documents, the terms of this Agreement shall prevail, except that in the event of any conflict between the terms of this Agreement and the terms of the Note, the terms of the Note shall prevail.

2.2   EVIDENCE OF INDEBTEDNESS.  Subject to and upon the terms and conditions of this Agreement, the Lender agrees to lend and to make available to the Borrower and the Borrower agrees to accept and borrow from the Lender up to a maximum principal sum of One Million Eight Hundred Thousand and No/100 ($1,800,000.00) Dollars pursuant to the Loan, which indebtedness shall be evidenced by the Note executed and delivered by the Borrower this date to the Lender.

2.3   COLLATERAL.  The Note and all other Obligations shall be secured by the Mortgage, the Contract Assignment, the Construction Assignment, and the Guarantees, all in accordance with the terms and provisions of this Agreement.

2.4   LOAN PURPOSES AND USES.  The proceeds of the Loan shall be used by the Borrower for the purposes of financing the Borrower's acquisition of the Property and paying the Borrower's Construction Costs incurred in connection with the construction and installation of the Improvements.

5

2.5     FEE.  The Borrower shall pay to the Lender herewith a loan commitment fee of Nine Thousand and no/100 ($9,000.00) Dollars.

ARTICLE THREE
CONDITIONS PRECEDENT

The obligation of the Lender to make the Loan available to the Borrower is subject to the Borrower's obligation to execute and/or deliver to the Lender, or the waiver by the Lender of the Borrower's obligation to execute and/or deliver to the Lender, at or prior to the Closing, the following instruments and documents, all of which shall first be reviewed by and must be reasonably acceptable to the Lender and its legal counsel as to both form and substance:

3.1     LOAN DOCUMENTS.  The Note, the Mortgage, the Guarantees, the Contract Assignment, the Construction Assignment, the Loan Commitment, appropriate UCC-1 Financing Statements, and the written opinion of legal counsel to the Borrower and the Guarantors with respect to various matters stipulated by the Lender, including without limitation, the validity and enforceability of the Loan Documents. At or immediately upon Closing, the Borrower shall record and file in the appropriate recording offices, the Mortgage, the Contract Assignment, the UCC-1 Financing Statements, and any other Loan Documents which the Lender shall then require to be recorded or filed.

3.2     TITLE INSURANCE AND DOCUMENTS.  The Borrower shall deliver to the Lender the Title Commitment from the Title Company, whereby the Title Company shall commit to insure the Mortgage as of the date and time of its recordation as a good and valid first mortgage upon the Property, without exception other than as shall first be reviewed and approved by the Lender, subject to fulfillment of the requirements precedent therein to the issuance of the final lender's title insurance policy. The Borrower covenants and agrees to provide to the Lender prior to Closing, for review and approval, copies of all exceptions to title listed in the Title Commitment. Immediately upon recordation of the Mortgage, the Borrower shall cause the Title Company to issue and deliver to the Lender the final lender's title insurance policy insuring the Mortgage as good and valid first mortgage upon the Property as of the date and time of recording thereof, in conformity with the Title Commitment and without exception other than previously set forth in the Title Commitment and thereafter approved by the Lender.

3.3     SURVEY.  The Borrower shall submit to the Lender an ALTA/ACSM survey of the Property prepared by a registered Florida land surveyor acceptable to the Lender. The survey shall set forth, at a minimum, the following items pertaining to the Property: (1) the courses and measured distances of all exterior property lines, building set-back lines and easements; (2) the total area within the exterior boundaries expressed in square footage and/or acreage; (3) the location and dimensions of all encroachments by or onto the Property; (4) the location and the dimensions of all existing Improvements upon the Property; (5) a certification or other evidence satisfactory to the Lender that all streets and other means of ingress and egress abutting the Property have been completed,

6

WCSR 3501184v2

dedicated and accepted for public maintenance and public use and that all utilities and water lines servicing the Property enter the Property from such abutting public streets; (6) a certification that no portion of the Property is situated within a flood hazard area, as defined in the Flood Disaster Protection Act of 1973, as amended from time to time; (7) a certification that there are no other easements, rights-of-way, party walls, encroachments, or improvements located on, crossing or affecting the Property that are visible, recorded or known to the surveyor which are not shown on the survey; (8) the current zoning classification and tax map reference number(s) of the Property; (9) the location, by reference to the Title Commitment, of all easements and encumbrances upon, crossing or affecting the Property; and (10) such other information as the Lender may reasonably require.

3.4     ORGANIZATIONAL DOCUMENTS.  The Borrower shall submit to the Lender its written and executed Certificate, to which shall be attached true, correct and complete copies of its Articles of Incorporation, its Bylaws, a current Certificate of Existence issued by the Secretary of State for the State of South Carolina, and appropriate resolutions authorizing the transactions contemplated herein and designating its authorized signatories who shall have the power and authority to execute and deliver all Loan Documents on its behalf.

3.5     CONSTRUCTION DOCUMENTS.  The Borrower shall submit to the Lender the following construction documents at or prior to the initial Advance hereunder, all of which shall also be subject to the review and approval of the Inspecting Agent prior to the initial Advance:

      A.     The Plans, including a complete final Site Plan of the Property.

      B.     The Construction Contract.

      C.     The Engineer's Contract.

      D.     Contractor Financials.  Financial Statements from the Contractor that shall be in satisfactory form, content and detail.

      E.     Construction Budget.  The Development Cost Analysis, attached hereto as Exhibit "B".

      F.     Contractor General Liability Insurance.  General Liability Insurance in compliance with the Insurance Requirements set forth hereinafter, in a minimum amount of not less than Three Million and No/100 ($3,000,000.00) Dollars single limits coverage and Three Million and No/100 ($3,000,000.00) Dollars aggregate coverage.

7

G.   <u>Governmental Requirements</u>.   Evidence of compliance with all applicable Governmental Requirements, including without limitation, all zoning certificates, building permits, storm drainage system approvals, erosion control and environmental protection permits, curb cuts and encroachment permits, and occupancy permits.

3.6   <u>INSURANCE DOCUMENTS</u>.   Policies of insurance, with receipts indicating payment in full of all premiums thereon, in full compliance with all Insurance Requirements set forth hereinafter, shall be delivered to the Lender at or prior to Closing with respect to the following:

A.   <u>Public Liability Insurance</u>.   Public Liability Insurance in a minimum amount of not less than Two Million and No/100 ($2,000,000.00) Dollars single limits coverage and Two Million and No/100 ($2,000,000.00) Dollars aggregate coverage. .

3.7   <u>OTHER DOCUMENTATION</u>.   Such other and further documentation as the Lender may reasonably require, including without limitation the following documents:

A.   <u>Environmental Evaluation Report</u>.   A satisfactory environmental evaluation report, conducted by a qualified environmental engineering and testing service acceptable to the Lender, addressed to the Lender, which establishes that no Hazardous Materials are known to be on or beneath the surface of the Property or, if any such Hazardous Materials shall be found to be present, that measures have been taken by the Borrower to fully and adequately remove the same from the Property or otherwise comply with all applicable Governmental Requirements and to fully cure and correct all consequences upon the Property of the presence of such Hazardous Materials thereon prior to their removal.

B.   <u>Public Utility Service and Availability</u>.   Written evidence satisfactory to the Lender that public utility service, including without limitation, water, sanitary sewer, storm sewer, electricity, and telephone is presently available to or will be brought to the boundaries of the Property in the course of the construction of the Improvements in sufficient size and quantity to accommodate all contemplated uses thereat and that no moratoriums or other limitations are known or contemplated which might in any way limit the availability or capacity of such service to the Improvements to be constructed on the Property.

C.   <u>Appraisal</u>.   A current written appraisal of the Property, to be prepared by a qualified Member, Appraisal Institute, acceptable to the Lender, conforming in form and content to all requirements established by the Lender, which shall establish a Loan to fair market value of the Property (inclusive of the

8

Improvements to be installed thereon) ratio of not greater than seventy-five (75%) percent.

   D.   Acquisition Documents.   Copies of all purchase contracts and related documentation pursuant to which the Borrower has the right to acquire the Property.

   3.8   CLOSING DISBURSEMENT.   A closing statement which shall evidence the payment by the Borrower at Closing of all expenses of or connected with the closing of the Loan, including without limitation the full loan commitment fees stated in the Loan Commitment, all recording fees and documentary stamps connected with recording of any Loan Documents, all title insurance premiums, title examination fees, bond and insurance premiums, surveyors' charges, appraisal fees, inspection fees, civil engineering fees, environmental assessments and analyses, due diligence expenses, attorneys' fees for the Lender's and the Borrower's attorneys, and any other applicable reasonable costs and expenses associated or connected with the closing of the Loan.

ARTICLE FOUR
CONSTRUCTION AND DISBURSEMENT PROVISIONS

Advances shall be made by the Lender pursuant to the following provisions upon compliance by the Borrower with the following construction provisions and requirements:

   4.1   INITIAL ADVANCE.   The Borrower shall be entitled to an initial Advance at Closing of up to _____ and No/100 ($_____.00) Dollars, which shall be available for the sole purpose of funding the Borrower's acquisition of the Property and certain approved closing costs incurred in connection therewith and with the Closing of the Loan. Thereafter, Advances shall be made available to the Borrower only in accordance with the remaining terms and provisions of this Article Four.

   4.2   CONSTRUCTION   COVENANTS   AND   REQUIREMENTS.   The Borrower covenants and agrees to comply with the following provisions and requirements during the construction and installation of the Improvements.

   A.   Use.   Advances hereunder shall be used in accordance with the Budget for the sole purpose of paying the Direct Costs and Indirect Costs approved by the Lender in accordance with the Budget and incurred in the design, construction and installation of the Improvements on the Property pursuant to the Construction Documents, which Construction Documents shall not be materially amended without the prior written approval by the Lender.

   B.   Standards.   The Borrower shall cause all construction and installation of the Improvements to be performed diligently, continuously and

9

WCSR 3501184v2

strictly in accordance with all applicable Governmental Requirements, including without limitation, the Americans with Disabilities Act, building codes, zoning ordinances and environmental regulations, and strictly in accordance with the Construction Documents.

C.   Assurance of Completion.  Within ten (10) days following written notification to the Borrower from the Lender, the Borrower shall deposit with the Lender, collected funds which, in the Lender's reasonable judgment, shall be sufficient, when added to any undisbursed portion of the Loan, to assure completion of construction and installation of the Improvements and payment in full of all Construction Costs, in accordance with the Plans. All funds deposited with the Lender shall be disbursed by the Lender in accordance with the terms of this Agreement.

D.   Inspection.  The Lender and its Inspecting Agent shall have the right, at any time during the construction and installation of the Improvements, to enter upon and inspect the Property and the construction and installation of the Improvements thereon. The Lender shall have the right to require that all work and materials materially failing to conform to the Construction Documents, or any applicable Governmental Requirement, in the reasonable judgment of the Lender or its Inspecting Agent, be corrected or replaced so as to fully and completely conform thereto. Neither the existence nor the exercise of the inspection and approval rights contained herein shall impose upon the Lender or its Inspecting Agent any duty or obligation to grant such approval nor shall the same impose upon the Lender any liability to the Borrower or any other party whatsoever, it being acknowledged that such rights, the exercise thereof, and the employment of the Inspecting Agent are for the sole benefit of the Lender, and that the Lender and the Inspecting Agent make no representations and assume no obligations or liabilities to the Borrower or any other party with respect to the quality of construction and installation of the Improvements or the absence of defects therefrom.

E.   Materials.  All materials incorporated in the construction and installation of the Improvements shall be free and clear of any lien or security interest as of (a) the time of delivery thereof to the Property, or (b) upon disbursement of the Advance from which the cost of such materials are to be funded. The Borrower shall, upon request of the Lender, produce such contracts, receipts, or other proof of the foregoing.

F.   Corrections.  The Borrower shall notify the Lender in writing of any material departure from the Plans and shall, without demand from the Lender, correct any material defects in the Improvements or material departures from any of the Construction Documents or any applicable Governmental Requirements promptly following discovery of the same. The disbursement of any Advances by

10

WCSR 3501184v2

the Lender shall not constitute a waiver of the Lender's right to require strict compliance with the foregoing covenant, whether or not such defects or departures from the Plans shall have theretofore been discovered or called to the attention of the Lender.

G. Acts of the Lender. The Borrower hereby agrees, with respect to all Advances, that the Lender shall not be deemed the agent or trustee for the Borrower and will not be held accountable in any fashion for any Advance made in good faith.

H. Subcontractors and Suppliers. The Borrower shall not execute any material contract other than the Construction Documents or otherwise become a party to any arrangement for the performance or rendering of labor, services or work, or the supplying or furnishing of materials in the construction and installation of the Improvements, except as shall be first disclosed to and approved by the Lender and only with persons or entities thereafter approved by the Lender in its reasonable discretion. For the purposes of this subsection, "material" contracts are defined as those having a value greater than Fifty Thousand and no/100 ($50,000.00) Dollars.

I. Change Orders. The Borrower shall deliver to the Lender an original and one counterpart of all proposed material change orders to or affecting the Construction Documents or the construction or installation of the Improvements prior to the execution or approval of any such change order by the Borrower. No material change order shall become effective until it has been approved in writing by the Lender. Notwithstanding the foregoing, change orders not exceeding Twenty-Five Thousand and no/100 ($25,000.00) Dollars per single order or Fifty Thousand and no/100 ($50,000.00) Dollars in the aggregate shall not require the Lender's approval.

J. Consultants. The Lender shall have the right to select and retain additional outside professional consultants, in addition to the Inspecting Agent, at the sole reasonable cost and expense of the Borrower, if in the reasonable judgment of the Lender, the employment of such consultants is necessary or reasonably justifiable to investigate any actual or potential concerns relating to the design, construction and/or the installation of the Improvements.

K. Copies of Contracts. The Borrower shall cause the Contractor to deliver to the Lender, promptly upon request, copies of all contracts, subcontracts, purchase orders and invoices pertaining to the work to be performed pursuant to the Construction Contract and the Plans, and copies of any contracts, bills of sale, statements, receipted vouchers or agreements under which the Borrower holds or claims title to any materials, fixtures or other articles incorporated or to be incorporated into the Improvements.

11

WCSR 3501184v2

4.4    CONDITIONS PRECEDENT TO ADVANCES.  The obligation of the Lender to make any Advance hereunder is subject to the compliance by the Borrower with the following requirements at the time of each such Advance:

A.    Representations and Warranties.    All representations and warranties of the Obligors contained in this Agreement and all Loan Documents shall remain true and correct in all material respects.

B.    Other Conditions.  All Conditions Precedent set forth in Article Three hereinabove shall have been and shall remain fulfilled in all material respects.

C.    Builder's Risk Insurance.  The Borrower shall have furnished to the Lender and shall maintain completed value builder's risk insurance covering all Improvements to be constructed and installed and all building materials, supplies and components delivered to or stored upon the Property against loss or damage due to fire or other casualty, including all risk (with special extended coverage endorsement, if appropriate) insurance in an amount of not less than the full replacement cost of the Improvements, which coverage shall remain in full force and effect until completion of the Improvements and delivery at such time or any earlier time of full replacement value fire and hazard insurance coverage, inclusive of such completed Improvements.

D.    Performance.  The Borrower shall have fully performed all duties and obligations required to be performed hereunder as of or prior to the date of such requested Advance.

E.    Construction in Place.  The construction and installation of the Improvements in place as of the date of the requested Advance shall have been made substantially in accordance with the Construction Contract and the Plans as modified by any change orders approved by the Lender, and all prior Advances shall have been used solely for the purposes permitted under this Agreement.

F.    No Defaults.  The Borrower shall not be in breach or default in the performance or observance of any other terms and provisions of this Agreement or of any other Loan Document, and there shall have been no material adverse change in the financial condition of the Borrower or any Guarantor subsequent to the day of execution of this Agreement, except as shall have been reported in writing to the Lender and approved or waived in writing by the Lender.

G.    Damage.    The Improvements in place shall not have been materially damaged or injured by fire or other casualty or condemned or threatened by condemnation; or if so damaged or condemned, provisions

12

WCSR 3501184v2

satisfactory to the Lender shall have been agreed upon in writing and duly executed by the Borrower, the Contractor, and the Lender for repair or restoration thereof in accordance with this Agreement and the Mortgage.

H.    Payment of Construction Costs.  The Borrower shall have paid all outstanding sums then due and owing for Direct Costs and approved Indirect Costs, if any, incurred in the construction and installation of the Improvements, except for such Construction Costs as will be paid from the proceeds of the Advance requested by the Borrower.

I.    No Modifications.    No changes, modifications, supplements, alterations or amendments to or of the Plans or the Construction Contract shall have been made in any material respect without the prior written approval of the Lender.

J.    Compliance with Advance Procedures.  The Borrower shall fully comply as to each Advance with all Procedures for Advances set forth hereinafter.

4.5    PROCEDURES FOR ADVANCES.    The following procedures and requirements shall be followed and adhered to in connection with all requests for, approvals of, and disbursements of Advances hereunder:

A.    Frequency. Following the initial Advance hereunder, the Borrower shall be entitled to request Advances no more frequently than monthly.

B.    Requests For Advances.  The Borrower shall request Advances by submitting to the Lender, at least five (5) business days in advance of the date upon which the Borrower requests that the Advance be disbursed, duplicate copies of a "Draw Request", with one copy to be submitted to the Lender and one copy to the Inspecting Agent. Each "Draw Request" shall consist of a standard AIA Form Request for progress payment, AIA documents G702 and G703, duly executed and certified by or on behalf of the Borrower. The copy of the Draw Request submitted to the Lender shall further be accompanied by the written certificate of the Borrower, in form and content satisfactory to the Lender, certifying as of the date of the Draw Request that the Borrower is in full compliance with all terms and conditions of this Agreement and containing an estimate by the Borrower of the remaining costs of completing the construction and installation of the Improvements following disbursement of the requested Advance, together with copies of invoices and such other supporting details and documentation with respect to any of the foregoing as the Lender shall require from time to time.

C.    Title Insurance Endorsement.  An endorsement to the previously issued lender's title insurance policy, to be issued by the Title Insurer as of the proposed disbursement date of the requested Advance, insuring the continued first

13

WCSR 3501184v2

lien of the Mortgage without exception other than as stated in the original policy, or as thereafter approved by the Lender, advancing the date of the policy to the date and time of such endorsement, and increasing the coverage of the policy to the aggregate amount of disbursed Loan proceeds (including the Advance then disbursed) outstanding as of the date thereof.

D.   <u>Inspection Report</u>.  Upon receipt of a Draw Request, and prior to the date of the requested Advance, the Inspecting Agent shall review the Draw Request and shall physically inspect the progress of construction and installation of the Improvements to date and, at the option of the Inspecting Agent, all construction records with respect thereto maintained by the Borrower and the Contractor, whereupon the Inspecting Agent shall deliver to the Lender and the Borrower its written report that the Draw Request is acceptable or unacceptable, in which latter event the Inspecting Agent shall specify the defects in the Draw Request and any specific items with respect thereto which it recommends to be disallowed or devalued.

E.   <u>Amount of Advances</u>.  Following its receipt of each Draw Request and Inspection Report complying with the foregoing requirements, the Lender shall determine the amount of each Advance upon the basis of the actual costs of the construction and installation of the Improvements to date less amounts previously advanced, subject to any matters set forth in the Inspection Report and any limitations which the Lender may reasonably determine to exist pursuant to subsections (F) and (G) hereinafter, from which amount as is determined by the Lender shall be deducted such retainage as shall be set forth hereinafter.

F.   <u>Retainage</u>.  The Lender shall be entitled to withhold from the approved amount of any Advance any fees due to the Inspecting Agent, together with a retainage in the amount set forth in the Construction Contract. All inspection fees shall be disbursed by the Lender and all retainage withheld by the Lender shall be pledged as additional collateral for the Loan and held until the time of disbursement of the Final Advance as set forth hereinafter.

G.   <u>Rights of Lender</u>.  Notwithstanding any other provisions hereof, the Lender shall not be obligated to make any Advance in the event that the Lender or the Inspecting Agent determines that there are any uncorrected structural defects in any of the Improvements or any material departures from the terms of the Plans; or any uncorrected violations of any applicable Governmental Requirements; or that there are insufficient undisbursed funds remaining under the Loan to complete the Improvements in accordance with the Plans and/or the Budget; or that any interest payments due under the Note shall not be paid fully current. No waiver by the Lender of any Condition Precedent, Construction Requirement, Procedure for Advance, Representation, Warranty or Covenant herein in connection with any Advance hereunder shall be construed as a waiver

14

of the Lender's right to require strict compliance with the same or any other Condition Precedent, Construction Requirement, Procedure for Advance, Representation, Warranty or Covenant in connection with any subsequent Advance hereunder.

   H.   Method of Disbursement.   Upon compliance with all of the foregoing Procedures for Advances, the Lender will cause the amount of the approved Advance to be remitted on or prior to the date for which such Advance was requested, to the Borrower, unless any Event of Default has occurred and is then continuing, in which event the Lender shall have the absolute right at its sole discretion to remit such Advance through the Title Insurer, directly to the Borrower, directly to the Contractor, to any subcontractors, materialmen or laborers directly, or jointly to the Borrower and any combination of any of the foregoing parties.

4.6   FINAL ADVANCE.   At such time as the Borrower notifies the Lender that it has completed the construction and installation of all of the Improvements upon the Property pursuant to the Plans, the Lender small make the final Advance (including disbursement of retainages previously held back by the Lender) hereunder and shall thereupon close off the revolving line of credit represented by this Agreement to any further Advances hereunder; provided that the Borrower shall first comply with the following additional requirements, in addition to those hereinabove set forth:

   A.   Final Draw Request.   The Borrower's final Draw Request shall be submitted to the Lender at least ten (10) business days prior to the requested disbursement date of the Final Advance, and shall be accompanied by the following additional items.

   B.   Borrower's Certificate.   The Borrower shall provide its written certificate, in form and content satisfactory to the Lender, certifying to the completion of construction and installation of the Improvements in accordance with the Plans and with all applicable Governmental Requirements.

   C.   Completion Affidavits.   The Borrower shall provide sworn affidavits of the Borrower and the Contractor stating that all Advances have been used by the Contractor solely to pay for labor and services performed and rendered, or materials supplied or furnished in connection with, the construction and installation of the Improvements; that the Construction Costs have been paid in full or, upon funding of the final Advance will be paid in full; and that all construction and installation of the Improvements has been completed in accordance with the Construction Contract, the Plans, and all applicable Governmental Requirements.

15

D.    <u>Certificate of Substantial Completion</u>. The Borrower shall furnish to the Lender a Certificate of Substantial Completion, AIA Document G704, executed by the Borrower and the Contractor.

E.    <u>Lien Waivers</u>. The Borrower shall deliver to the Lender complete and final notarized mechanic's lien waivers from the Contractor, and any subcontractors or materialmen reasonably required by the Lender or the Title Insurer, in form and content acceptable to the Lender and the Title Insurer.

F.    <u>Compliance with Governmental Requirements</u>. The Borrower shall deliver to the Lender certified copies of any certificates of approval, acceptance or compliance required or reasonably determined to be necessary by the Lender or by any applicable Governmental Authority for the use and occupancy of the Property.

G.    <u>Final Inspection Report</u>. The Inspecting Agent shall deliver to the Lender its final written certificate in form and content reasonably satisfactory to the Lender, stating that all work to be performed pursuant to the Construction Contract has been fully completed substantially in compliance therewith and with the Plans.

H.    <u>As-Built Survey</u>. The Borrower shall deliver to the Lender a final current as-built subdivision survey of the Property showing all Improvements thereon, and complying with all other Survey Requirements set forth hereinabove.

I.    <u>Title Insurance Endorsement</u>. The Borrower shall deliver to the Lender a final endorsement to the previously issued Lender's Title Insurance Policy, insuring the continued first lien of the Mortgage without exception other than as stated in the original policy and as approved by the Lender, advancing the date of the policy to the date of final disbursement, and insuring the Mortgage for the full amount of the Loan disbursed by the Lender hereunder.

**ARTICLE FIVE**
**REPRESENTATIONS AND WARRANTIES**

In order to induce the Lender to enter into and execute this Agreement and to make the Loan to the Borrower, the Borrower makes the following representations and warranties to the Lender, each of which shall survive the execution of this Agreement and remain in full force and effect until complete payment and discharge of the Obligations:

5.1    <u>EXISTENCE</u>. The Borrower is a corporation duly organized, validly existing and in good standing under the laws of the State of South Carolina, with full power and authority to enter into the Loan, to execute and deliver the Loan Documents and to perform in accordance with the terms thereof.

16

WCSR 3501184v2

5.2   AUTHORITY.  The Borrower has full power and authority to own the Property and to execute, deliver and perform the Borrower's Obligations under the Loan Documents. The Borrower has taken all appropriate action whereby its designated officer is and has been authorized to execute and deliver this Agreement and the Loan Documents on behalf of the Borrower. The execution, delivery and performance by the Borrower of the Loan Documents does not and will not require the consent of any other parties or any Governmental Authorities not previously obtained and delivered to the Lender (except as to such future performance, if any, contemplated hereunder as may require subsequent approvals or consents of applicable Governmental Authorities), nor will the same contravene the governing documents of the Borrower or any applicable Governmental Requirements presently in effect, nor will the same result in any breach of or constitute a default under any agreement or instrument to which the Borrower is a party or by which the Property is affected.

5.3   LEGALLY ENFORCEABLE AGREEMENT.  This Agreement and each of the Loan Documents are duly and properly executed and delivered by the Obligors for value received and constitute the valid Obligations of the Obligors, legally binding upon and enforceable against the Obligors in accordance with their respective terms, not subject to any defense based upon usury, capacity of the Obligors or, to the best of the Borrower's knowledge, other defense, except as may be *subsequently limited by* bankruptcy, insolvency, reorganization, moratorium and other similar laws affecting the enforcement of creditors' rights generally.

5.4   DOCUMENTATION.  The Obligors, as applicable, have delivered to the Lender all documents, financial statements, certificates, licenses, permits, authorizations, consents, exemptions, approvals, and contracts required to be submitted to the Lender hereunder, or required by any applicable Governmental Authority, all of which are material conditions precedent to the funding of the Loan by the Lender and all of which are, to the best of the Borrower's knowledge, true, accurate and complete in all material respects as of the date hereof.

5.5   FINANCIAL STATEMENTS.   All financial statements heretofore furnished to the Lender are complete and correct in all material respects and fairly present the financial condition of the Obligors as of the dates thereof and the results of their operations for the periods covered by such statements. All such financial statements have been prepared in accordance with generally accepted accounting principles consistently applied and no material adverse change has occurred in the financial condition or operations of the Obligors reflected therein since the dates thereof.

5.6   LITIGATION.  No actions, suits or proceedings are pending or, to the best of the Borrower's knowledge, threatened before any Court, Governmental Authority or arbitrator (a) involving the validity, priority or enforceability of this Agreement, the Note, the Mortgage, any Loan Documents, any Construction Documents, or the Borrower's title

17

to and the Lender's Mortgage upon the Property, or (b) against or affecting the Borrower or any Guarantor which may, in any one case or in the aggregate, materially adversely affect the financial conditions, affairs, properties or business operations of the Obligors or the ability of the Obligors to perform any of the Obligations, whether singly or in the aggregate.

5.7     NO DEFAULTS.  To the best of the Borrower's knowledge, the Obligors are not presently in default under any of the terms or conditions of this Agreement, the Note, the Mortgage, any of the Loan Documents, any Construction Documents, or any order, injunction, judgment, award, or decree of any applicable judicial or Governmental Authority; or, in any material respect, any other Mortgage, lease, bank loan, credit agreement or other instrument to which the Obligors, or any of them, are a party or by which the Obligors, or any of them, may be bound or affected.

5.8     OPERATIONS.   The execution, delivery and performance of the Obligations by the Borrower do not and will not violate or contravene any provisions of any instrument creating or governing the operations of the Borrower, and will not result in a breach of or constitute a default under any other mortgage, bank loan, credit agreement or other instrument to which the Borrower or any Guarantor is a party or by which the Borrower or any Guarantor may be bound or affected.

5.9     DISCLOSURE.  To the best of the Obligors' knowledge, no representation or warranty of the Obligors contained in this Agreement or any other Loan Documents and no statement contained in any certificate, schedule, list, financial statement or instrument now or hereafter to be furnished to the Lender by or on behalf of the Obligors contains or will contain any untrue statement or omission of any material fact.

5.10    SOLVENCY.   There is not pending or, to the best of the Obligors' knowledge, threatened by or against any of the Obligors, nor is there contemplated any petition in bankruptcy, order for relief (whether voluntary, involuntary or by operation of law), any assignment for the benefit of creditors, any petition seeking reorganization or arrangement under the bankruptcy laws of the United States of America or any state thereof, any liquidation of all or the greater portion of the property of any of the Obligors or any other action brought under the aforesaid bankruptcy laws or other similar laws involving any of the Obligors.

5.11    COMPLIANCE WITH GOVERNMENTAL REQUIREMENTS.  To the best of its knowledge, the Borrower is in full material compliance with all applicable Governmental Requirements pertaining to the Borrower, the Property, and the construction and installation of the Improvements.

5.12    UTILITIES.  All public utility service, including without limitation water, power, sanitary sewer, storm sewer and drainage, gas, and telephone, which may be necessary for the construction, installation and operation of the Improvements for their

18

WCSR 3501184v2

intended purpose are available to the boundaries of the Property or (if not currently available) will be extended to the boundaries of the Property, are or will be unencumbered, are or will be located in a publicly dedicated and accepted right-of-way, and are or will be in sufficient size, quantity, capacity and pressure to accommodate all intended uses and operations at the Property.

5.13   USE OF PROCEEDS.  The proceeds of the Loan shall be used by the Borrower solely for the purpose of financing the Borrower's acquisition of the Property and the development, design, construction, and installation of the Improvements as set forth herein, together with such other incidental costs related thereto as may be permitted in writing from time to time by the Lender, and for no other purposes whatsoever.

5.14 .  INGRESS AND EGRESS.  All streets and roads necessary for ingress and egress to the Property and for the full use and operation of the Improvements for their intended purposes have been completed or, if not currently available, will be built and dedicated for public use and accepted for maintenance by the appropriate Governmental Authorities, except as to such private means of ingress and egress for which recorded permanent easements exist and which have been approved in writing by the Lender herewith.

5.15   TAXES.  The Obligors have filed all federal, state and other tax returns required to be filed and has fully paid all taxes required under such returns. None of the Obligors have received any notice from the Internal Revenue Service or any other Governmental Authority asserting that any additional assessments or taxes are or may be due.

5.16   ENVIRONMENTAL MATTERS.   To the best of the Borrower's knowledge, (a) the Property is free from Hazardous Materials in violation of any Governmental Requirement and do not constitute an environmental hazard of any type under any applicable Governmental Requirement; (b) there has been no production, disposal, storage, release, discharge, spill, leak, dumping, or emission on the Property of any Hazardous Materials or any activity thereon which could have produced Hazardous Materials or toxic effects on humans, flora, or fauna; (c) there are no surface impoundments, lagoons, waste piles, land fills, injection wells, underground storage areas, or other manmade facilities thereat which have contained or accommodated Hazardous Materials; (d) neither the Borrower nor any third parties have developed, discharged, buried, released or otherwise placed Hazardous Materials on the Property, including the soil, surface water or ground water thereof; (e) there are no buried, partially buried, above ground or other tanks, storage vessels, drums or containers located on the Property; (f) there is no evidence of the release, discharge, leaking, dumping, emission, or seepage, by accident or otherwise, of Hazardous Materials onto or into the Property; (g) there has been no treatment, storage, disposal, discharge or other type of release of Hazardous Materials onto property adjacent to or near to the Property which may constitute a risk of contamination of the Property or of surface or ground water flowing to

19

or through the Property; and (h) the proposed operations on the Property, including construction and installation of the Improvements thereon and materials to be generated therewith, do not and will not generate Hazardous Materials in violation of applicable Governmental Requirements. The Borrower has conducted or commissioned a complete environmental assessment of the Property to determine the presence of any Hazardous Materials thereat; and, to the best of the Borrower's knowledge, no other inspections, audits, or investigations have been commissioned or conducted with respect thereto by any prior owner, third party or Governmental Authority. The Borrower has received no warning, notice of violation, administrative complaint, judicial complaint or other formal or informal notice with respect to any Hazardous Materials on the Property and is not aware of any current or previous owner thereof receiving any such notices or complaints from any Governmental Authority with respect thereto. All environmental permits and licenses required pursuant to any applicable Governmental Requirements with respect to the Property and the conditions thereon have been obtained and are currently valid, or would not normally be required at this time and may be obtained in the ordinary course of business, including without limitation licenses and permits with respect to storage, treatment, and disposal of all waste products. To the best of the Borrower's knowledge, the construction and operation of the Improvements will not violate any applicable Governmental Requirements for environmental protection, including without limitation the Federal Clean Air Act, the Federal Clean Water Act, the Federal Resource Conservation and Recovery Act, the Comprehensive Environmental Response, Compensation and Liability Act, the National Environmental Policy Act, and any other Federal, state or local statute of like tenor and effect.

5.17   THE PLANS.  The Plans are satisfactory to the Borrower and have been approved, to the extent that approvals are required, by all applicable Governmental Authorities and by all affected beneficiaries of any applicable properly recorded and indexed private restrictive covenants, as the case may be, and are in compliance with all applicable Governmental Requirements, including without limitation the Americans with Disabilities Act.

5.18   CERTAIN LEGAL MATTERS.   Each Obligor represents that such Obligor has not been convicted of any federal, state or local felony crimes whatsoever, nor has any such Obligor been subject to any civil judgment or any regulatory order or finding involving fraud, securities violations or other matters relating to financial responsibility or business integrity, or been the subject of any bankruptcy, insolvency, receivership, assignment for benefit of creditors or similar proceedings.

5.19   ASSET OWNERSHIP.  Each Obligor has good and marketable title to all of the properties and assets reflected on its financial statements submitted to the Lender in connection with the Loan, and all such properties and assets are free and clear of any deeds of trust, mortgages, liens, security interests, pledges and other encumbrances, except as otherwise reflected in said financial statements.

20

## ARTICLE SIX
## COVENANTS

The Borrower hereby covenants with the Lender for the duration of the Loan as follows:

6.1    INSPECTIONS.   Upon reasonable advance notice, the Borrower shall permit the Lender, the Inspecting Agent, and any other persons designated by the Lender to enter upon and inspect the Property during normal business hours, and all materials to be used in the construction and installation of the Improvements, and to examine the Plans and all related plans and shop drawings which may be maintained at the Property, and to discuss the progress of construction or any of the foregoing with the Contractor and the Borrower. The Borrower shall make available for audit, inspection and copying all property, equipment, books, contracts, records, leases, rent rolls and other papers and information related to the Borrower, the construction, installation or operation of the Improvements or the Property. The Borrower agrees to comply with all reasonable requirements and recommendations of the Lender with respect to any matters revealed by any of the foregoing inspections.

6.2    COMPLIANCE WITH GOVERNMENTAL REQUIREMENTS.   The Borrower shall cause the construction, installation and operation of the Improvements to comply with all applicable Governmental Requirements, including without limitation the Americans with Disabilities Act, and with all recorded restrictive covenants and easements affecting the Property.

6.3    TAXES AND ASSESSMENTS.   The Borrower shall promptly pay and discharge (or contest, provided the Borrower shall comply with the applicable provisions of the Mortgage) all taxes, assessments and other charges and levies imposed upon the Property or upon the Borrower or upon any of the income or other property of the Borrower, as well as all claims of any kind which, if unpaid, might become a lien or charge upon or against the Property.

6.4    COSTS AND EXPENSES.   The Borrower shall promptly pay when due all reasonable charges, fees and expenses required to satisfy the terms and conditions of this Agreement, including without limitation all taxes and recording expenses, all reasonable legal fees and expenses of the Lender's and the Borrower's legal counsel, all reasonable fees and expenses of the Inspecting Agent, and all other costs and expenses of any nature incurred pursuant to the terms of this Agreement.

6.5    FURTHER ASSURANCES.   The Borrower shall execute and deliver, or cause to be executed and delivered, to the Lender such further documents, instruments, certificates, assurances and other items, and shall do all such additional and further acts and deeds which the Lender shall deem reasonably necessary or desirable to comply with the terms and conditions of, or to effectuate the intent of, this Agreement or to preserve or protect the collateral or security for any of the Obligations.

21

WCSR 3501184v2

6.6    BOOKS AND RECORDS.  The Borrower shall keep and maintain full and accurate accounts and records with respect to the construction, installation and operation of the Improvements, in accordance with generally accepted accounting principles consistently applied.

6.7    INDEMNITY.  The Borrower shall indemnify, defend and hold harmless the Lender from and against all third-party liens, claims, demands, actions, causes of action, assessments, losses, damages, liability, costs and expenses, including without limitation, interest, reasonable attorneys' fees and penalties, arising out of, affecting or in connection with the Loan, the Property, the design, construction, installation and/or operation of the Improvements, the quality, condition or value of the Improvements, the execution and performance of this Agreement or any other Loan Documents, any acts or omissions of the Borrower, any breach of this Agreement or any of the Loan Documents, the disbursement of Advances by the Lender, any lien or claim of lien filed for record against the Property or the Borrower, or the sale of Lots. The provisions of this Section 6.7 shall survive the payment and discharge of the Note and shall remain in full force and effect for so long as the possibility of any such liabilities, damages, losses, costs and expenses shall exist. This indemnity shall not apply with respect to conditions or occurrences first arising after title to the Property is transferred by foreclosure or deed in lieu of foreclosure or with the consent of the Lender; provided, however, the foregoing indemnity shall continue to apply to conditions or occurrences in existence before title to the Property is transferred by foreclosure or deed in lieu of foreclosure or with the consent of the Lender which are not discovered until after the transfer of the Property.

6.8    FINANCIAL STATEMENTS.  The Borrower shall furnish to the Lender annual financial statements consisting of statements of income and expenses, profits and losses, and balance sheets related to the Property and all construction and operations thereon, within one hundred twenty (120) days following the end of the Borrower's fiscal or calendar year, together with annual signed financial statements and tax returns as to the Borrower, annual signed financial statements and copies of filed tax returns (including attached schedules) as to the Guarantors, and such other financial information or statements as to the Borrower and the Guarantors which the Lender may request by not less than thirty (30) days prior written notice from time to time, all to be in form and content satisfactory to the Lender.

6.9    DEPOSIT ACCOUNT RELATIONSHIP.  The Borrower shall maintain its primary deposit account relationship with the Lender.

6.10    NOTICE OF LITIGATION.  The Borrower shall promptly furnish to the Lender promptly upon receipt thereof, copies of any pleadings in litigation, notices of bankruptcy, notices of default, or notices of any proceedings before any Governmental Authority which involve the Property; the construction, installation or operation of the Improvements; any licenses, permits or approvals pertaining thereto; the Borrower;

22

and/or any Guarantor, and which in any instance, alone or in the aggregate with other actions or proceedings, if determined adversely to the Borrower or the Guarantor, could have a material adverse effect on the financial condition, affairs, properties or operations of the Borrower or the Guarantors or their ability to perform under the Loan Documents.

6.11   ALTERATION OF IMPROVEMENTS OR PROPERTY.   The Borrower shall not materially alter or change the Improvements or the Property except in accordance with the Plans, applicable Governmental requirements, and this Agreement, nor shall the Borrower engage in any other businesses or activities at the Property other than that which has been presented to the Lender, without the express prior written consent of the Lender.

6.12   MAINTENANCE OF INSURANCE.   The Borrower shall maintain and furnish to the Lender copies of all insurance policies and renewals thereof required of the Borrower pursuant to this Agreement and the Loan Documents in full force and effect throughout the term of the Loan with a Best's Insurance Reports Policyholder's Rating of A or A+ or better and a financial size category of Class X to XV or better, with such terms and deductibles as shall be acceptable to the Lender. Such policies and renewals thereof shall be held by the Lender, shall contain a noncontributory endorsement making losses payable to the Lender only up to the outstanding Obligations, and shall provide that the same shall not be canceled except upon thirty (30) days prior written notice to the Lender. At least fifteen (15) days prior to the expiration date of all such policies or renewals thereof, renewals of such policies satisfactory to the Lender shall be delivered to the Lender marked "Premium Paid" or accompanied by other evidence of premium payments satisfactory to the Lender. All such policies shall designate the Lender as the mortgagee or Loss Payee.

6.13   LICENSES AND PERMITS.   Throughout the term hereof, the Borrower shall maintain in full force and effect all certificates, licenses, permits, authorizations, consents and approvals from applicable Governmental Authorities relating to the construction, installation and/or operation of the Improvements; and the Borrower shall obtain all certificates, licenses, permits, authorizations, consents and approvals required for the full use, occupancy and operation of the Improvements following construction thereof from all applicable Governmental Authorities and shall deliver copies of the same to the Lender upon request.

6.14   SIGNS AND PUBLICITY.   If requested by the Lender and permitted under applicable Governmental Requirements, the Borrower shall erect on the Property a sign to be provided by the Lender stating that the Lender is providing construction financing for the Improvements, which shall be placed and maintained in a prominent location on the Property satisfactory to the Lender. The Borrower further grants permission to the Lender to otherwise publicize the financing of the Improvements.

23

6.15   PERFORMANCE PURSUANT TO LOAN DOCUMENTS.   The Obligors shall at all times perform in accordance with and comply with all terms, conditions, covenants, requirements, representations and warranties set forth herein, in the Note, the Mortgage and all of the Loan Documents.

6.16   ENVIRONMENTAL COMPLIANCE.   Neither the Borrower nor the Borrower's agents, employees or tenants shall generate, manufacture, refine, transport, treat, store, handle, dispose of, release, discharge, produce or process any Hazardous Materials at or upon the Property in violation of any applicable Governmental Requirements. The Borrower, and its agents, employees and tenants shall comply with all Governmental Requirements regarding environmental protection, shall keep the Property free and clear of any liens imposed pursuant to any applicable Governmental Requirements respecting environmental protection, and shall conduct and complete all investigations, studies, sampling and testing, and all remedial, removal and other actions necessary to clean up and remove any Hazardous Materials on, from or affecting the Property pursuant to any applicable Governmental Requirements. The Borrower shall indemnify, defend and hold harmless the Lender from and against all liens, claims, damages, actions, causes of action, losses, damages, liabilities, costs, and expenses whatsoever, including without limitation, penalties and reasonable attorney's fees, incurred or suffered by or asserted against the Lender, for, with respect to, or as a direct or indirect result of the presence on or under, or the escape, seepage, leakage, spillage, discharge, emission or release upon or from the Property of any Hazardous Materials, regardless of whether the same may be caused by or within the control of the Borrower, whether intentional or unintentional, or due to the violation of any applicable Governmental Requirements regarding environmental protection or of any covenant or representation contained herein with respect thereto by the Borrower. The foregoing covenants, provisions and indemnities shall survive any foreclosure or other realization by the Lender on the Mortgage which may result in acquisition by the Lender or conveyance by the Lender of fee title, or any other lesser right, title and interest, in or to the Property. This indemnity shall not apply with respect to conditions or occurrences first arising after title to the Property is transferred by foreclosure or deed in lieu of foreclosure or with the consent of the Lender; provided, however, the foregoing indemnity shall continue to apply to conditions or occurrences in existence before title to the Property is transferred by foreclosure or deed in lieu of foreclosure or with the consent of the Lender which are not discovered until after the transfer of such Property.

6.17   SUBORDINATION OF FEES.   The Borrower shall not enter into any agreement of any nature with any affiliated or unaffiliated persons, funds or entities with respect to the development of the project or the management of the operation of the Property, unless such agreement(s) shall provide that the same shall not survive any foreclosure of the Property or other realization on the Mortgage by the Lender. Any agreement with any affiliated persons shall provide that no management, development or similar fees will be paid by the Borrower with respect to the management or development

24

WCSR 3501184v2

of the Property unless and until all monthly debt service requirements set forth herein shall have been met and fully paid by the Borrower.

     6.18    PRESERVATION OF EXISTENCE.  The Borrower shall preserve and maintain its existence as presently constituted in good standing throughout the term of the Loan.

ARTICLE SEVEN
DEFAULT AND REMEDIES

     7.1    EVENTS OF DEFAULT.  The term "Event of Default", whenever used hereinafter, shall mean any one or more of the following events:

     A.    Occurrence of an Event of Default set forth or defined in the Note, the Mortgage or any of the Loan Documents which is not cured within any applicable grace period set forth therein, including without limitation failure to timely pay or perform any Obligations set forth therein, with a default thereunder to constitute a default hereunder.

     B.    Failure by the Borrower to fully, completely and timely perform or observe any Obligations under this Agreement or to observe, satisfy and comply with any of the terms, covenants, conditions, requirements, restrictions and provisions of this Agreement, which failure is not cured within such grace period with respect thereto as is set forth herein or, if no grace period is set forth herein as to any such failure, if such failure is not cured within thirty (30) calendar days following written notice thereof from the Lender; provided, however, that if such default cannot reasonably be cured within the 30-day period, then the Borrower shall have an additional reasonable time to cure (but not to exceed sixty days in the aggregate) provided both that the Borrower has begun and is diligently pursuing efforts to cure within the 30 day period and that the default is reasonably susceptible of being cured.

     C.    Falsity in any material respect of any representations or warranties contained herein as and when made.

     D.    Discontinuance at any time during the construction and installation of the Improvements for a period of ten (10) or more consecutive business days, except for discontinuances due to fire, labor disputes, strikes, acts of God, material shortages for specific materials essential to the construction of the Improvements, or other causes beyond the control of the Borrower.

     E.    Entry of an order or decree by any Court of competent jurisdiction enjoining the construction or installation of the Improvements or enjoining or prohibiting the Borrower or the Lender from performing in accordance with this

25

WCSR 3501184v2

Agreement, which proceedings are not discontinued or which order or decree is
not vacated or stayed within twenty (20) days after the entry thereof.

     F.    The construction and installation of the Improvements, in the sole
reasonable judgment of the Lender, shall not be capable of being completed in
accordance with the Plans upon disbursement of the remaining undisbursed Loan
proceeds, and the Borrower shall have failed to deposit in collected funds with the
Lender, within ten (10) days following written notification to the Borrower, such
sum as the Lender shall have reasonably determined to be necessary to enable the
construction and installation of the Improvements to be completed in accordance
with the Plans.

7.2   <u>REMEDIES UPON DEFAULT</u>.  Upon occurrence of any Event of
Default, the Lender shall have the right to immediately exercise any and all of the
following rights and remedies without further notice to the Borrower:

     A.   <u>Remedies in Loan Documents</u>. In addition to all other rights and
remedies set forth herein, the Lender shall have the absolute right to assert and
exercise any and all rights and remedies set forth in the Note, the Mortgage and all
of the Loan Documents.

     B.   <u>Termination</u>. The Lender may suspend or terminate all obligations
of the Lender under this Agreement, including without limitation, the obligation
of the Lender to make further Advances, with the further right to apply any
retainage or escrows then held by it to the outstanding Obligations.

     C.   <u>Performance of Work</u>.  The Lender through its employees,
independent contractors, agents or any receiver appointed for such purposes by
any Court of competent jurisdiction, may enter upon the Property, perform or
cause to be performed any and all work and labor, and supply and cause to be
supplied any and all materials, equipment and improvements necessary to
complete the Improvements substantially in accordance with the Plans, to secure
and protect the same, to use any undisbursed portion of the Loan in connection
with the foregoing, with all such sums so expended (including without limitation
reasonable attorneys' fees) to be deemed to have been advanced to or for the
benefit of the Borrower hereunder and secured by the Mortgage and the Loan
Documents. In pursuance of the foregoing, the Borrower hereby authorizes and
grants to the Lender the right to do any of the following:

     i.   Take possession of the Property, and complete the
construction and installation of the Improvements substantially in
accordance with the Plans and the Budget;

26

WCSR 3501184v2

      ii.      Make such additions, changes and corrections in the Plans which the Lender may deem necessary or desirable in its reasonable discretion to complete the Improvements in substantially the manner contemplated therein;

      iii.      Employ such contractors, subcontractors, agents, engineers, architects, attorneys-at-law, inspectors, builders, laborers or other personnel to perform or cause to be performed any action reasonably desired by the Lender in order to complete the Improvements substantially in accordance with the Plans;

      iv.      Use any funds of the Borrower on deposit with the Lender, all retainages heretofore retained by the Lender hereunder, and any sums then held in escrow, together with any balance of the Loan which has not previously been advanced hereunder, for any purpose consistent with any of the provisions hereof;

      v.      Pay, settle or compromise all existing or future bills, expenses or claims of any nature which are or may become liens against the Property or may be necessary or desirable as the Lender in its reasonable discretion deems proper, for the completion of the Improvements or for the protection or clearance of the title to the Property, or the Lender's interest therein;

      vi.      Prosecute, defend, settle or compromise any action or proceeding at law or in equity or before any Governmental Authority involving the Loan, the Property, and/or the construction and installation of the Improvements thereon;

      vii.      Execute in its name or, if necessary, in the name of the Borrower as its attorney-in-fact, all applications, certificates or instruments which may be necessary or desirable for the doing of any action which the Lender takes or causes to be taken hereunder;

      viii.      Take such action and require such performance under any insurance coverage, bond or other obligation and execute, in its own or the Borrower's name, such applications for additional or renewal bonds, policies or other obligations as the Lender may deem advisable;

      ix.      Do any and all acts which the Borrower might do in connection with the Property, the construction and installation of the Improvements, and the Loan.

27

WCSR 3501184v2

D.     <u>Costs and Expenses</u>.  All reasonable costs and expenses of every nature and kind incurred by the Lender in the exercise of any of the foregoing remedies, including without limitation reasonable attorneys' fees, shall be and constitute a portion of the Obligations, which shall be secured by the Mortgage and all of the Loan Documents.

E.     <u>No Waiver</u>.  No delay or failure by the Lender to exercise any right or remedy conferred hereunder, and no making of any additional Advances after occurrence of any Event of Default hereunder, shall be deemed a waiver by the Lender of any future right to exercise such right or remedy or of any right to withhold any future Advance or of any other right or remedy provided herein; nor shall any waiver of any Event of Default be deemed to be a waiver of any other Event of Default or of the future occurrence of the same Event of Default.

F.     <u>Nature of Remedies</u>.  All of the foregoing rights and remedies are cumulative and concurrent; shall be in addition to any other right, power and remedy set forth herein or in any of the Loan Documents, and now or hereafter existing in law at equity, or otherwise; and may be pursued separately, successively or concurrently against the Borrower and/or the Property at the sole discretion of the Lender.

<u>ARTICLE EIGHT</u>
<u>MISCELLANEOUS</u>

8.1     <u>ENTIRE AGREEMENT</u>.  This Agreement supersedes all prior discussions between the Obligors and the Lender with respect to the Loan and contains the sole and entire understanding between the parties with respect to the Loan except for such other terms and conditions as may be set forth in the Loan Documents. No amendments, conditions, deletions, modifications or changes to or of this Agreement shall be of any force or effect whatsoever unless reduced to writing and executed by the parties hereto.

8.2     <u>SURVIVAL</u>.  All representations, warranties and covenants made herein shall survive the execution and delivery of this Agreement and the disbursement of the Loan, and shall remain in full force and effect until complete payment and discharge of all Obligations.

8.3     <u>SEVERABILITY</u>.  Wherever possible, each provision of this Agreement shall be interpreted in such a manner as to be effective and valid under applicable law, but unenforceability or invalidity for any reason of any provision of this Agreement shall be limited strictly to such provision and shall not limit or impair the operation, validity or enforceability of any other provision of this Agreement.

28

WCSR 3501184v2

8.4   COUNTERPARTS.   This Agreement may be executed in multiple counterparts, each of which shall be deemed an original, and all of such counterparts together shall constitute one and the same Agreement.

8.5   TIME IS OF THE ESSENCE.   Time is and shall be of the essence of this Agreement and all performance hereunder.

8.6   RELATIONSHIP OF PARTIES.   Neither any provision of this Agreement or any of the Loan Documents nor any acts of the parties to this Agreement or any of the Loan Documents shall be construed to create a partnership or joint venture between the Obligors or the Contractor and the Lender nor to make any party the agent or representative of the other, nor shall any provision hereof nor any acts of the parties hereunder be construed to make the Lender liable to anyone for any labor or services performed or rendered on, or materials supplied or furnished to, the Property or for any debts or claims accruing against the Borrower on account thereof. Nothing in this Agreement shall be construed to create any privity of contract or other relationship between the Lender and anyone performing or rendering labor or services on, or supplying or furnishing materials to, the Property or for the construction or installation of the Improvements thereon. In all respects the relationship of the Borrower and the Lender hereunder shall be solely that of debtor and creditor.

8.7   NO THIRD PARTY BENEFICIARIES.   All conditions to the obligations of the Lender to make Advances under this Agreement are imposed solely and exclusively for the benefit of the Lender. Neither the Borrower, nor the Contractor, nor any other person shall have standing to require satisfaction of any such condition or be entitled to assume that the Lender will make or refuse to make Advances in the absence of strict compliance with any and all provisions hereof, and neither the Borrower, nor the Contractor, nor any other person shall, under any other circumstances, be deemed to be a beneficiary of any such conditions, any or all of which may be freely waived in whole or in part by the Lender at any time if in its sole discretion the Lender deems it advisable to do so. The Lender makes no representations or warranties and assumes no obligations or responsibility whatsoever with respect to the quality of the construction or installation of the Improvements.

8.8   NOTICES.   All notices, requests, demands and other communications allowed, made or required to be made pursuant to the terms of this Agreement shall be in writing and shall be deemed to be given or made when personally delivered (including personal delivery by Federal Express or other nationally recognized overnight private courier service) or when deposited in the United States mail, registered or certified, postage prepaid, return receipt requested, addressed in any such event to the party to whom such communication is directed at such address as is set forth for such party in the Loan Documents or at such other address as may hereafter be designated in writing by the respective parties hereto.

29

WCSR 3501184v2

8.9     GOVERNING LAW.  This Agreement and all of the Loan Documents shall be governed and construed under and in accordance with the laws of the State of South Carolina, except to the extent provided otherwise in the Mortgage and the Contract Assignment.

8.10    CONSENT TO JURISDICTION.  The Obligors, by execution of this Agreement, agree that any legal actions or proceedings with respect to this Agreement and, at the Lender's sole option, any other Loan Documents shall be subject to the jurisdiction of and shall be brought in any state or federal court of competent jurisdiction sitting in either the State of South Carolina or the State of Florida, to which jurisdictions and venues the Obligors hereby irrevocably consent by execution hereof. The Obligors each irrevocably waive any objection, including without limitation any objection to the laying of venue based on the grounds of forum non conveniens, which they or any of them may now or hereafter have to the bringing of any such action or proceeding in either such jurisdiction. Nothing herein shall affect the right of the Lender to serve process in any manner permitted by law nor shall limit the right of the Lender to bring proceedings upon any other Loan Documents or against another party to any of the Loan Documents in the courts of any other jurisdiction.

8.11    HEIRS, SUCCESSORS AND ASSIGNS.   This Agreement shall be binding upon and inure to the benefit of the parties hereto and their respective heirs, successors and assigns, provided that the Borrower shall not assign or otherwise transfer voluntarily, involuntarily or by operation of law any rights, responsibilities, liabilities or Obligations hereunder except pursuant to the applicable provisions of the Mortgage and with the express written consent of the Lender as provided thereunder.

8.12    PARTICIPATION.  The Borrower hereby acknowledges that the Lender may now or hereafter sell, assign, transfer or grant participation in, or otherwise dispose of all or portions of the Lender's rights, title and interest in and to the Loan, this Agreement and the Loan Documents, none of which shall be construed to alter or waive any Obligations whatsoever of the Obligors hereunder.

8.13    CAPTIONS.  The headings and captions in this Agreement are included only as a matter of convenience and for reference, and in no way define, limit, extend or describe the scope of this Agreement or the intent of any other provision hereof.

30

WCSR 3501184v2